UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

BONNIE M. HICKEY                         CIVIL ACTION

VERSUS                                   NO: 12-2630

W.W. GRAINGER, INC., et al.              SECTION: R(2)

<u>**ORDER AND REASONS**</u>

This is an action for review of the denial of long-term
disability benefits under an employee disability benefit plan
governed by the Employee Retirement Income Security Act of 1974,
29 U.S.C. §§ 1001-1461 ("ERISA"). Pursuant to the Court's
September 12, 2013 order permitting the parties to submit the
case for judgment on the administrative record,[1] plaintiff Bonnie
Hickey and defendants W.W. Grainger, Inc. ("Grainger") and
Prudential Insurance Company of America ("Prudential") filed
motions for judgment as a matter of law.[2] For the following
reasons, Hickey's motion is DENIED and the defendants' motion is
GRANTED.

## I.  **Background**

Hickey worked as a government sales account manager for
Grainger.[3] On May 3, 2010, she applied to Prudential for

_____

[1] R. Doc. 15.

[2] R. Docs. 28, 34.

[3] R. Doc. 28-2 at 5.

disability benefits.[4] She stopped working approximately one week later, allegedly due to dizziness and vertigo.[5] She received short-term disability benefits from May 2010 through November 2010, and long-term disability benefits from December 2010 through April 2011.[6] Prudential terminated her benefits effective May 1, 2011.[7] Hickey twice appealed the denial of benefits, and Prudential twice affirmed.[8]

A.   *The Plan*

Hickey's claim arises under Grainger's Long Term Disability Plan.[9] Grainger is the plan administrator, and Prudential is the claims administrator.[10] The plan provides financial protection for covered employees by paying a portion of their income during long periods of disability.[11] As relevant here, the plan defines "disability" to mean that an employee is "unable to perform the **material and substantial duties** of [her] **regular occupation** due

---

[4] R. Doc. 16-6 at 41.

[5] *Id.*; R. Doc. 28-2 at 6.

[6] R. Doc. 36-1 at 2-3.

[7] R. Doc. 28-9 at 1.

[8] R. Doc. 28-7 at 59, 117; R. Doc. 28-9 at 110, 118.

[9] R. Doc. 28-10.

[10] *Id.* at 38-39.

[11] *Id.* at 2.

to [her] *sickness* or *injury*."[12] In determining whether an employee is disabled, "Prudential will assess [the employee's] ability to work and the extent to which [she is] able to work by considering the facts and opinions from: [her] doctors; and specified doctors, other medical practitioners or vocational experts."[13]

The plan defines "material and substantial duties" as those duties that "are normally required for the performance of [the employee's] regular occupation; and cannot be reasonably omitted or modified, except that if [the employee is] required to work on average in excess of 40 hours per week, [she] will be considered able to perform that requirement if [she is] working or [has] the capacity to work 40 hours per week."[14] It defines "regular occupation" as "the occupation [the employee is] routinely performing when [her] disability begins."[15] Prudential considers the employee's occupation "as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location."[16] The plan defines "sickness" as "any

---

[12] *Id.* at 10 (emphases in original).

[13] *Id.*

[14] *Id.* at 35 (emphasis removed).

[15] *Id.* at 37.

[16] *Id.*

disorder of your body or mind, but not an injury; pregnancy
including abortion, miscarriage or childbirth."[17]

B.   *Hickey's Job*

Hickey's job description provides that the primary function
of an account manager is to "[m]aximize sales . . . by growing
sales within existing accounts, [and] identifying and developing
new accounts at a level consistent with [Grainger's]
expectations."[18] Prudential classifies this job as a "light duty"
occupation, "which is defined as lifting, carrying, pushing, and
pulling 20 pounds occasionally and frequently up to 10 pounds or
negligible amount[s] constantly. This occupation can include
walking and[/]or standing frequently even though weight is
negligible and it can also include pushing and/or pulling of arm
and[/]or leg controls."[19]

On July 14, 2010, Grainger informed Prudential via email
that Hickey's job requires her to drive "on a daily basis."[20] In
another email, forwarded to Prudential on May 24, 2011, a
Grainger employee stated that, as a salesperson, Hickey "is

---

[17] *Id.*

[18] R. Doc. 28-7 at 36.

[19] R. Doc. 28-9 at 112.

[20] *Id.* at 81.

4

required to drive and travel some distance."[21] Prudential does not dispute that Hickey's occupation requires driving.[22]

C.   *Medical and Claims History*

On or about May 10, 2010, Hickey stopped working, allegedly due to dizziness and vertigo.[23] Four days later, Dr. Bryce LeBlanc, an otolaryngologist, completed an attending physician statement for Hickey.[24] He stated that she suffered from "Loss of Balance, sometimes severe" and that she "CANNOT Return to work until balance problem resolves."[25]

On May 20, 2010, Hickey saw Dr. Donald Adams, a neurologist.[26] Dr. Adams noted that Hickey had an "abrupt onset of difficulty with vertigo and problems with her balance. The latter change occurs in a background of an approximately one to one [and] one-half year history of aural fullness affecting the right ear and some decline, which has been objectively verified, in her hearing in that ear. . . . Her functional impairments have declined substantially in the last week, but she still is not

---

[21] R. Doc. 28-7 at 66.

[22] *See* R. Doc. 28-9 at 112.

[23] R. Doc. 16-6 at 41; R. Doc. 28-2 at 6.

[24] R. Doc. 28-8 at 27-28.

[25] *Id.* at 28.

[26] *Id.* at 58.

comfortable driving."[27] Dr. Adams concluded that Hickey's "history strongly suggested that she had developed Ménière's disease."[28]

On July 1, 2010, Hickey underwent an audiological evaluation.[29] The audiologist reported severe high frequency sensorineural hearing loss in Hickey's right ear, and normal hearing in her left ear.[30] On July 14, 2010, Hickey underwent vestibular laboratory testing.[31] The results of her sensory organization test, oculomotor screening battery, step velocity tests and vestibular visual fixation were deemed normal.[32] The results of her motor control test, slow harmonic acceleration tests and visual vestibulo ocular reflex were deemed abnormal.[33] Dr. Moisés Arriaga interpreted the abnormal results as suggestive of a "non-localizing finding," a "non-lateralizing peripheral finding" and a "central finding."[34]

---

[27] *Id.*

[28] *Id.* at 59.

[29] *Id.* at 71.

[30] *Id.*

[31] R. Doc. 28-7 at 129.

[32] *Id.* at 129-30.

[33] *Id.*

[34] *Id.* at 131.

6

On August 19, 2010, Dr. James Lin, an otolaryngologist, wrote to Dr. LeBlanc that examination revealed that Hickey had "no nystagmus" and that "[c]erebellar, Romberg, and gait testing are all actually much better."[35] His "impression" was "Right atypical Ménière's with uncompensated vestibulopathy."[36] He concluded, "I think it would be okay for her to try to return to some restricted work duties at this time and continue [physical] therapy."[37]

On August 20, 2010, Dr. Lin completed an attending physician statement.[38] In the field labeled "Medical Obstacles to Return to Work," he wrote, "Dizziness."[39] He stated that Hickey's "[s]ymptoms prohibit driving/travel."[40] Six days later, he completed a "Fitness for Duty" form.[41] There, he stated that Hickey could resume work with restrictions, specifically "Limited driving (preferably [less than] 20 miles [per] day)."[42]

---

[35] R. Doc. 28-8 at 88.

[36] *Id.*

[37] *Id.*

[38] R. Doc. 28-8 at 137.

[39] *Id.*

[40] *Id.*

[41] R. Doc. 28-7 at 138.

[42] *Id.*

The next day, August 27, 2010, Hickey wrote to Dr. Lin, stating, "Please disregard my request to return to work with restrictions. . . . I have acknowledged my limitations and realize I am not ready to handle yet another direction of focus. . . . This past week I have experienced weakness, fatigue, insomnia, stress, and frustration with no time to complete my daily physical therapy."[43]

On September 13, 2010, Kelly Bernard, Hickey's physical therapist at East Jefferson General Hospital, wrote that Hickey "[r]ecently . . . reported that her symptoms had been exacerbated with the onset of lightheadedness and weakness."[44] Bernard stated that "Dr. Lin has advised her not to return to work at this time. I agree with his recommendations, primarily to increase her level of safety."[45]

On October 8, 2010, Bernard wrote that Hickey "has been making slow progress, with continued complaints of dizziness onset. This presentation may currently prohibit her from performing her full job tasks safely. She is currently under Doctor Lin's orders to not return to work, and this will be re-assessed at her next appointment with him in November."[46]

---

[43] R. Doc. 28-8 at 82.

[44] *Id.* at 154

[45] *Id.*

[46] *Id.* at 155.

At some point on or before October 12, 2010, Dr. Lin completed an undated attending physician statement.[47] In the field labeled "Medical Obstacles to Return to Work," he wrote "Symptoms associated [with] vertigo/dizziness."[48] He specified that Hickey suffered from "Meniere's disease – atypical."[49]

On November 16, 2010, Bernard wrote that Hickey "has continued to make slow but steady gains in her therapeutic progression . . . . However, she still complains of intermittent episodes of dizziness and loss of equilibrium during positional head/truck changes with upright activity. . . . The prognosis is unclear whether full resolution of symptoms will be reached."[50] Three days later, Dr. Lin wrote to Dr. LeBlanc that "Hickey feels like she has plateaued. She still does not feel right in the head and is easily fatigable by the end of the day."[51] He noted his "impression" as "Right atypical Meniere's. She still has uncomplicated right-sided vestibulopathy."[52]

---

[47] *Id.* at 117-18.

[48] *Id.* at 117.

[49] *Id.*

[50] *Id.* at 156.

[51] R. Doc. 28-9 at 2.

[52] *Id.*

On December 30, 2010, Hickey underwent additional vestibular laboratory testing.[53] The laboratory report states that Hickey "is doing much better than [when] we first saw her in April. However, having been through 6 months of VRT clinician-directed and at-home, she is very frustrated at her current state."[54] The testing resulted in two abnormalities: left-beating spontaneous nystagmus and unreliable vestibular autorotation test data.[55] Dr. Arriaga interpreted the nystagmus as suggestive of a "non-localizing finding," and the unreliable test data as potentially due to technical error.[56]

On February 17, 2011, Hickey underwent another audiological evaluation, as well as further vestibular laboratory testing.[57] The audiologist reported that Hickey displayed severe sensorineural hearing loss at 8000 hertz in her right ear, chronic uncompensated vestibulopathy in her right ear, and normal hearing in her left ear.[58] The laboratory test results indicated abnormal left-beating spontaneous nystagmus, "suggestive of a

_____

[53] R. Doc. 28-8 at 13.

[54] _Id._

[55] _Id._

[56] _Id._ at 14.

[57] R. Doc. 28-7 at 45, 46.

[58] _Id._ at 45.

non-localizing finding."[59] The same day, Dr. Lin wrote to Dr. LeBlanc that Hickey "is unchanged essentially. It sounds like she is plateaued in her activity levels, despite maximal exercises."[60] He noted his impression as "Right atypical Ménière's"[61]

On February 28, 2011, Hickey underwent another audiological evaluation.[62] The audiologist reported no significant change since the last audiogram, recording severe sensorineural hearing loss at 8000 hertz in Hickey's right ear.[63] The same day, Dr. Lin wrote to Dr. LeBlanc, stating, "I think she might have a migraine-related component, which might explain why she has had such . . . recalcitrant problems and persistent left beating nystagmus."[64]

On March 17, 2011, Hickey underwent another audiological evaluation.[65] The audiologist reported severe sensorineural

---

[59] *Id.* at 46.

[60] *Id.* at 52.

[61] *Id.*

[62] *Id.* at 23.

[63] *Id.*

[64] *Id.* at 51.

[65] *Id.* at 31.

hearing loss in Hickey's right ear at 8000 hertz, and normal hearing in her left ear.[66]

On March 18, 2011, Dr. Lin wrote to Dr. LeBlanc that Hickey "does have a little tendency to left beat nystagmus," and gave his impression as "Possible right atypical Ménière's with a possible migraine component."[67] The same day, Hickey completed an "Activities of Daily Living Questionnaire."[68] She stated that she could not drive to customer appointments as required for her job, because her ability to drive was limited to "low speed, back streets [and] [short] distance."[69]

On March 24, 2011, Dr. Lin completed a "Capacity Questionnaire."[70] He indicated that Hickey had "Part time transitional work capacity," though he could not determine the number of hours per week that she could work.[71] He indicated that she could sit continuously for up to eight hours but that she could not climb ladders or balance from heights and that she

---

[66] *Id.*

[67] *Id.* at 50.

[68] *Id.* at 32.

[69] *Id.* Hickey wrote that her ability to drive was limited to "low speed, back streets [and] distance." Based on the context, as well as previous communications between Hickey and Prudential, *see* R. Doc. 16-6 at 11, the Court concludes that she meant to write "short distance."

[70] R. Doc. 28-7 at 39.

[71] *Id.*

could only occasionally (one to thirty-three percent of the time) climb stairs.[72]

On March 31, 2011, Hickey was discharged from her physical therapy program at East Jefferson General Hospital due to "Lack of progress toward therapy goals/ plateaued progress."[73]

On April 13, 2011, Dr. Karyn Akey, a Prudential physician, conducted an internal review of Hickey's claim.[74] Although Dr. Akey indicated that Hickey's history supported a diagnosis of Ménière's disease, she concluded that "the exam findings have not indicated a severity, particularly in the most recent records, which would preclude occupational activity. This has been further supported by [Dr. Lin] based upon the most recent work capacity assessment."[75] Dr. Akey found that Hickey's reported ability to drive was "inconsistent with a severity of unpredictable vertigo and imbalance which is also exacerbated by positional changes (driving requires changes in head position, often times rapid)."[76] She wrote that "Dr. Lin has provided [an] opinion regarding capacity which would support a full time [occupation],"

---

[72] *Id.*

[73] *Id.* at 115.

[74] R. Doc. 28-9 at 29.

[75] *Id.* at 31.

[76] *Id.* at 32.

since he stated that Hickey "would be capable of sitting for up to 8 hours."[77]

Dr. Akey concluded that Hickey's "condition of vertigo" supported the following restrictions: "Avoid activities which involve rapid and/or repetitive changes in trunk or head/neck position," "Avoid walking over uneven ground/terrain," "No heavy lifting/carrying greater than 20 [pounds] occasionally or 10 [pounds] frequently," "Avoid ladder climbing or working at unprotected heights."[78] She concluded that driving restrictions are "not supported," because Hickey "reports these activities and there have been no restrictions supported by her attending provider."[79]

On May 3, 2011, Prudential terminated Hickey's long-term disability benefits, effective May 1, 2011.[80] Prudential wrote,

> Based on your medical information on file, you have undergone multiple specialty evaluations which have concluded that etiology of your symptoms to have been attributed to a condition called, "Meniere's Disease". After review of Dr. Lin['s] medical records you have the following restrictions and limitations[:] avoiding activities which involve rapid and/or repetitive changes in trunk or head/neck position, avoid walking over uneven ground/terrain, no heavy lifting/carrying greater than 20

---

[77] *Id.*

[78] *Id.* at 33-34.

[79] *Id.* at 34.

[80] *Id.* at 126.

14

> pounds occasionally or 10 pounds frequently and avoid
> ladder climbing or working at unprotected heights.[81]

Because Hickey's regular occupation qualifies as "light duty," Prudential concluded that "given the current restrictions and limitations it is reasonable to expect that you are capable of returning to work on a full and sustained basis at this time."[82]

On May 20, 2011, Hickey appealed the denial of benefits.[83] She wrote, "Your letter states that Dr. Lin's restrictions for me include . . . avoiding activities which involved rapid and/or repetitive changes in trunk or head/neck . . . . One of the main requirements of a professional outside sales representative is driving, which requires repetitive changes in head/neck position. This restriction would also apply to sales appointments and conversations with multiple people."[84]

On May 26, 2011, Dr. Lin wrote a letter "To Whom It May Concern," stating that Hickey "has had some sort of balance problems/vestibulopathy, for about two years at minimum" and "has still objective findings as well as problems with her balance, particularly with driving for long periods of time several times a day, and she fatigues quite easily due to that."[85]

---

[81] *Id.* at 127-28.

[82] *Id.* at 128.

[83] *Id.* at 59.

[84] *Id.*

[85] R. Doc. 28-7 at 114.

Prudential referred Hickey's appeal to Dr. David Foyt, an otolaryngologist, for an independent review.[86] Dr. Foyt noted that Hickey's most recent physical examination was "essentially normal. She had multiple serial audiograms that do show slight high frequency asymmetry but do[] not show low frequency fluctuations as one would notice with classic Ménière's disease."[87] Dr. Foyt wrote, "By the medical history I do not see any objective evidence for Ménière's disease."[88] He found "no objective evidence to recommend restrictions or limitations. There is not any objective evidence seen to recommend any restrictions and/or limitations for her ability to sit, stand, walk, reach, lift or perform upper extremity activities or drive."[89] He reiterated that he did "not see any objective evidence that [Hickey] should not be able to drive a motor vehicle."[90]

On June 22, 2011, Prudential denied Hickey's appeal.[91] Its decision relied on Dr. Foyt's opinion.[92] Prudential wrote,

---

[86] *Id.* at 74.

[87] *Id.* at 72.

[88] *Id.* at 72.

[89] *Id.* at 72-73.

[90] *Id.* at 73.

[91] R. Doc. 28-9 at 118.

[92] *Id.* at 119-120.

> After reviewing your medical records and job duties, we
> have determined that your multiple serial audiograms and
> physical examination findings do not support a need for
> restrictions and limitations that would prevent you from
> performing the material and substantial duties required
> by your regular light occupation . . . . We have
> considered the information from your physician regarding
> restrictions and find that there is insufficient
> documentation of a medical basis for such restrictions.[93]

On July 11, 2011, Hickey saw Dr. Lin but apparently did not
undergo further audiological evaluations or vestibular laboratory
testing.[94] The next day, Dr. Lin wrote to Dr. LeBlanc that
Hickey's "dizziness is a little better than last year but she
still has problems with sudden head movements and dizziness."[95]
He noted his impression as "Right atypical Ménière's versus
central vertigo with possible migraine component. We are unsure
as to what her actual diagnosis is at this time, although she
does have objective evidence that she has a right-sided
vestibulopathy."[96] He wrote, "I still believe it probably would
not be safe for her to drive for long distances given her
problems with rapid and repetitive head movements. . . .
Hopefully we can come up with a rehab therapy strategy for her

---

[93] *Id.* at 120.

[94] R. Doc. 28-7 at 140.

[95] *Id.*

[96] *Id.* at 143.

that will help relieve her symptoms and allow her to drive longer distances again."[97]

On July 19, 2011, Hickey underwent a physical therapy balance evaluation at LSU Health Sciences Center.[98] Rachel Trommelen, a physical therapist, found that Hickey suffered from gaze stabilization dysfunction, decreased balance, gait/ambulation dysfunction and dizziness.[99] Trommelen wrote that "[at] present significant imbalance makes work impossible."[100]

On July 25, 2011, Hickey appealed Prudential's denial of benefits a second time.[101] She wrote, "Due to my chronic symptoms, I was given the diagnosis of Atypical Menieres with vestibular hydrops. . . . It is obvious and apparent to everyone in my presence that I have been severely affected by this chronic condition and cannot perform my daily job duties or social activities."[102] She stated, "Driving is a responsibility and I don't feel it is in my best interest, with my current condition, or the safety of others to ignore the liability and risk of

---

[97] *Id.*

[98] R. Doc. 28-8 at 23.

[99] *Id.* at 24.

[100] *Id.*

[101] R. Doc. 28-7 at 117.

[102] *Id.* at 118.

injury by driving in heavy traffic all day while preoccupied conducting business."[103] She further stated,

> I drive on back roads, slow speeds, with minimal traffic to conduct my errands and attempt to manage more tasks. I do not drive every day nor do I drive all times of the day or in inclement weather. . . . Driving short trips to pick up milk etc. is not in any way comparable to the driving requirement of outside sales reps. I was encouraged to handle simple errands as part of my home recovery program since habituation exercises affect all daily activities.[104]

Prudential referred Hickey's second appeal to Dr. Martin Gizzi, a neurologist, for an independent review.[105] Dr. Gizzi wrote,

> Based on the records reviewed, Ms. Hickey has symptoms and signs of right vestibular loss in 2010. There is no objective evidence to support a diagnosis of Meniere's disease or central vestibular disease. While there are no limitations based on objective evidence, based on her history of vestibular loss she should be restricted from climbing or working at unprotected heights. These restrictions are permanent. She should be able to sit, stand, walk, reach, carry, lift and drive without difficulty. . . .

> Ms. Hickey's self-reported limitations such as her inability to perform any sustainable full time occupation are not supported by the objective evidence in the records reviewed. There is no reason a person with stable vestibular hypofunction should not be able to drive a car and there is no evidence in the record to indicate that she is unable to drive.

> The only attending physician statement to opine that Ms. Hickey was unable to work was that of Dr. LeBlanc on 5/14/10 based on imbalance. She had computerized dynamic

---

[103] *Id.* at 119.

[104] *Id.* at 121.

[105] R. Doc. 28-8 at 32-34.

posturography (CDP) on 7/14/10 that indicated normal balance.[106]

On September 7, 2011, Prudential denied Hickey's second appeal.[107] Its decision relied on Dr. Gizzi's opinion.[108] Prudential determined that, based on Dr. Gizzi's review, Hickey "would have permanent restrictions from climbing and working at unprotected heights" but that her occupation "does not require [her] to perform these activities."[109]

This suit followed. Hickey contends that Prudential's "refusal to pay benefits under the policy is arbitrary and unreasonable and constitutes an abuse of its discretion."[110]

## II.  Standard of Review – ERISA Claims

Under ERISA, "[i]n determining whether to pay or deny benefits, a plan administrator must make two general types of determinations." *See Schadler v. Anthem Life Ins. Co.*, 147 F.3d 388, 394 (5th Cir. 1998). First, it must determine the facts underlying the claim for benefits. *Id.* Second, it "must then determine whether those facts constitute a claim to be honored under the *terms* of the plan." *Id.* (emphasis in original) (quoting

---

[106] *Id.* at 33-34.

[107] R. Doc. 28-9 at 110.

[108] *Id.* at 111-12.

[109] *Id.* at 112.

[110] R. Doc. 1 at 3.

*Pierre v. Conn. Gen. Life Ins. Co./Life Ins. Co. of N. Am.*, 932
F.2d 1552, 1557 (5th Cir. 1991)) (quotation marks removed). If
the administrator denies benefits and the participant exhausts
the administrative prerequisites to suit, the participant may
bring a civil action "to recover benefits due to him under the
terms of his plan, to enforce his rights under the terms of the
plan, or to clarify his rights to future benefits under the terms
of the plan." 29 U.S.C. § 1132(a)(1)(B).

Under the standard established in *Firestone Tire and Rubber
Co. v. Bruch*, 489 U.S. 101, 115 (1989), an administrator's
decisions regarding plan terms and eligibility for benefits are
subject to *de novo* review in the district court "unless the
benefit plan gives the administrator or fiduciary discretionary
authority to determine eligibility for benefits or to construe
the terms of the plan." If the plan grants such discretion, the
administrator's determinations are reviewed only for abuse of
discretion. *Vercher v. Alexander & Alexander Inc.*, 379 F.3d 222,
226 (5th Cir. 2004). In the Fifth Circuit, an administrator's
factual determinations are always reviewed for abuse of
discretion, regardless of whether the plan grants the
administrator discretionary authority. *Id.*

Here, the plan states that Prudential, "as Claims
Administrator[,] has the sole discretion to interpret the terms
of the plan, to make factual findings, and to determine

eligibility for benefits. The decision of the Claims
Administrator shall not be overturned unless arbitrary and
capricious."[111] Accordingly, the abuse of discretion standard
applies.

Under this standard, the Court looks to whether the
administrator acted arbitrarily or capriciously. *Meditrust Fin.
Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 214 (5th
Cir. 1999). "A decision is arbitrary only if 'made without a
rational connection between the known facts and the decision or
between the found facts and the evidence.'" *Id.* at 215 (quoting
*Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich.*, 97 F.3d
822, 828 (5th Cir. 1996)). The Court will uphold the
administrator's decision "if it is supported by substantial
evidence." *Id.*

"Substantial evidence is 'more than a scintilla, less than a
preponderance, and is such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion.'" *Ellis v.
Liberty Life Assurance Co. of Boston*, 394 F.3d 262, 273 (5th Cir.
2004) (quoting *Deters v. Sec'y of Health, Educ. & Welfare*, 789
F.2d 1181, 1185 (5th Cir. 1986)). "The fact that the evidence is
disputable will not invalidate the decision; the evidence 'need
only assure that the administrator's decision fall somewhere on
the continuum of reasonableness — even if on the low end.'"

---

[111] R. Doc. 28-10 at 39.

*Porter v. Lowe's Cos., Inc.'s Business Travel Accident Ins. Plan*,
731 F.3d 360, 363-64 (5th Cir. 2013) (quoting *Corry v. Liberty
Life Assur. Co. of Boston*, 499 F.3d 389, 398 (5th Cir.2007)). In
reviewing Prudential's factual findings, the Court is limited to
the record that was available to Prudential. *See Southern Farm
Bureau Life Ins. Co. v. Moore*, 993 F.2d 98, 102 (5th Cir. 1993).

**III. Prudential's Decision Was Not Arbitrary or Capricious.**

In determining whether Hickey was disabled under the terms
of the plan, Prudential had a choice between the opinions of
Hickey's treating physicians and those of its own medical
experts. In *Black & Decker Disability Plan v. Nord*, 538 U.S. 822,
834 (2003), the Supreme Court held that while plan administrators
"may not arbitrarily refuse to credit a claimant's reliable
evidence, including the opinions of a treating physician . . .
courts have no warrant to require administrators automatically to
accord special weight to the opinions of a claimant's physician."
Accordingly, the Fifth Circuit has held that "an administrator
does not abuse its discretion when it relies on the medical
opinion of a consulting physician whose opinion conflicts with
the claimant's treating physician . . . even if the consulting
physician only reviews medical records and never physically
examines the claimant, taxing to credibility though it may be."

*Gothard v. Metro. Life Ins. Co.*, 491 F.3d 246, 249 (5th Cir. 2007).

In *Gothard*, the consulting physician concluded "that the medical records did not support any restrictions that would prevent [the plaintiff] from working." *Id.* at 249-50. Although her opinion conflicted with a note from the plaintiff's treating physician, and although the consulting physician did not physically examine the plaintiff, the Fifth Circuit concluded that the plan administrator's reliance on the consulting physician's opinion was not arbitrary or capricious. *Id.* at 250. The court indicated that a plan administrator is "allowed to adopt one of two competing medical views," as long as the view it adopts is not "in plain conflict with medical records." *Id.*

Here, Prudential adopted the views of Drs. Akey, Foyt and Gizzi, rather than those of Dr. Lin, Dr. LeBlanc and Hickey's physical therapists, all of whom indicated, at various times, that Hickey could not perform her regular occupation. The question for decision is whether the views of Drs. Akey, Foyt and Gizzi are in plain conflict with Hickey's medical records. The Court finds that they are not.

Drs. Akey, Foyt and Gizzi concluded, essentially, that the objective evidence does not indicate a severity of symptoms sufficient to preclude Hickey from performing her regular

occupation.[112] Dr. Akey found that Hickey's diagnostic evaluations were either normal, inconclusive or nonspecific for any clear pathology of impairment, except for her audiograms, "which support[] right sided severe high frequency sensorineural loss and normal left sided hearing."[113] She concluded that "[i]mpairment has been largely based upon the consistency of [Hickey's] self reported symptoms . . . as there has been no provided objective data . . . consistent with the level of impairment . . . reported by [Hickey]."[114] Dr. Foyt similarly observed that Hickey's audiograms "show a slight high frequency asymmetry."[115] He concluded that there was "no objective evidence to recommend restrictions or limitations."[116] Dr. Gizzi concluded that Hickey "has symptoms and signs of right vestibular loss" but that her "self-reported limitations . . . are not supported by the objective evidence."[117] He added, "There is no reason a person with stable vestibular hypofunction should not be able to drive a car."[118]

---

[112] *See* R. Doc. 28-7 at 72-72; R. Doc. 28-8 at 33-34; R. Doc. 28-9 at 31.

[113] R. Doc. 28-9 at 31.

[114] *Id.* at 33.

[115] R. Doc. 28-7 at 72.

[116] *Id.*

[117] R. Doc. 28-8 at 33-34.

[118] *Id.* at 34.

25

The Court finds that the medical records are not in plain conflict with these conclusions. The audiograms of July 1, 2010, February 17, 2011, February 28, 2011 and March 17, 2011 indicate that Hickey displayed high frequency hearing loss in her right ear and normal hearing in her left ear.[119] Hickey's vestibular laboratory testing yielded normal results on some tests and abnormal results on others.[120] The significance of the abnormal results, which Dr. Arriaga found suggestive of a "non-localizing finding," a "non-lateralizing peripheral finding" and a "central finding," is not evident from the record.[121] Hickey has not shown that these results, or any other objective findings in the record, are inconsistent with the conclusions of Drs. Akey, Foyt and Gizzi. The records of severe symptoms are generally notations of Hickey's subjective reports to her treatment providers, not notations of objective findings.[122]

Moreover, a number of documents in the record qualify the attending physician statements that support Hickey's claim. On

---

[119] R. Doc. 28-7 at 23, 31, 45; R. Doc. 28-8 at 71.

[120] R. Doc. 28-7 at 129-30; R. Doc. 28-8 at 13.

[121] R. Doc. 28-7 at 131; R. Doc. 28-8 at 14.

[122] *See, e.g.*, R. Doc. 28-8 at 58 ("she still is not comfortable driving"), 154 ("Recently she reported that her symptoms had been exacerbated with the onset of lightheadedness and weakness."), 155 ("continued complaints of dizziness onset"), 156 ("she still complains of intermittent episodes of dizziness and loss of equilibrium"); R. Doc. 28-9 at 2 ("She still does not feel right in the head and is easily fatigable by the end of the day.").

August 20, 2010, Dr. Lin stated that Hickey's symptoms "prohibit driving."[123] Six days later, however, he wrote that Hickey could drive up to twenty miles per day.[124] Most recently, he wrote, "We are unsure as to what [Hickey's] actual diagnosis is at this time . . . . I still believe it *probably* would not be safe for her to drive *for long distances*."[125] On May 14, 2010, Dr. LeBlanc wrote that Hickey "CANNOT Return to work until balance problem resolves."[126] A number of records, however, indicate that Hickey's condition improved over the next fourteen months.[127] Additionally, when Hickey wrote to Dr. Lin on August 27, 2010, retracting her request to return to work, she stated that she had recently "experienced weakness, fatigue, insomnia, stress and frustration," but not dizziness or vertigo.[128]

---

[123] R. Doc. 28-8 at 137.

[124] R. Doc. 28-7 at 138.

[125] *Id.* at 141 (emphases added).

[126] R. Doc. 28-8 at 28.

[127] *See* R. Doc. 28-7 at 39 (Hickey has "[p]art time transitional work capacity"), 138 (Hickey "is able to resume working with . . . restrictions/limitations"), 140 ("her dizziness is a little better than last year"); R. Doc. 28-8 at 13 ("She is doing much better than [when] we first saw her in April."), 58 ("Her functional impairments have declined substantially in the last week."), 88 ("Hickey has felt much better on physical therapy. . . . Cerebellar, Romberg, and gait testing are all actually much better this time than last time."), 156 ("[Hickey] has continued to make slow but steady gains in her therapeutic progression and ability to habituate to vestibular strengthening exercises.").

[128] R. Doc. 28-8 at 82.

The Court concludes that the views of Drs. Akey, Foyt and Gizzi are consistent with the objective findings and thus are not in plain conflict with the medical records. *See Gothard*, 491 F.3d at 249-50. Given the subjectivity and ambiguity of the evidence supporting Hickey's claim, the Court finds that Prudential did not "arbitrarily refuse to credit . . . reliable evidence." *Black & Decker*, 538 U.S. at 834. Rather, Prudential made a permissible choice between two competing medical views. *See Gothard*, 491 F.3d at 249-50.

The Court acknowledges that Dr. Akey's report is not pellucid on the question of driving restrictions. On the one hand, Dr. Akey found that Hickey should refrain from activities involving rapid changes in head position,[129] and she noted that driving is an activity requiring such changes.[130] On the other hand, she concluded that Hickey could drive without restrictions, because she reported being able to drive short distances.[131] In context, it appears that Dr. Akey concluded that, although the medical evidence supports restrictions on rapid head movement, driving restrictions should be qualified in light of Hickey's reported ability to drive. Dr. Akey specified that Hickey's reported ability to drive was inconsistent with the severity of

---

[129] R. Doc. 28-9 at 33.

[130] *Id.* at 32.

[131] *Id.* at 34.

vertigo she reported.[132] This observation is consistent with Dr. Akey's view that the medical records do not support the severity of symptoms reported.

In any event, the opinions of Drs. Foyt and Gizzi contain no inconsistencies on the question of driving restrictions. Dr. Foyt concluded that there was no objective evidence to recommend any restrictions, including driving restrictions.[133] Dr. Gizzi concluded that Hickey should be restricted from climbing or working at unprotected heights but that no further restrictions were warranted.[134] Prudential was permitted to rely on these opinions, which are not in plain conflict with the medical records, in affirming its denial of Hickey's claim.

The Court finds that the evidence in the administrative record is sufficient to support Prudential's decision. Specifically, the reports of Drs. Akey, Foyt and Gizzi, which are not in plain conflict with the medical records, offer substantial evidence to support Prudential's decision. The Court concludes that Prudential did not abuse its discretion in denying Hickey's claim for long-term disability benefits.

---

[132] *Id.*

[133] R. Doc. 28-7 at 72-73.

[134] R. Doc. 28-8 at 33-34.

## IV.  Conclusion

For the foregoing reasons, the Court DENIES Hickey's motion for judgment as a matter of law and GRANTS the defendants' motion for judgment as a matter of law.

New Orleans, Louisiana, this 23rd day of April, 2014.

_____

**SARAH S. VANCE
UNITED STATES DISTRICT JUDGE**